# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

April 17, 2020

BY ECF

The Hon. Raymond J. Dearie
The Hon. Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Andre Wilburn*, No. 19 Cr. 139 (RJD);
                *United States v. Andre Wilburn*, No. 19 Cr. 108 (MKB)

Dear Judge Dearie and Judge Brodie:

      This office represents Andre Wilburn in these separate prosecutions before Your Honors. I write to respectfully request Mr. Wilburn's temporary release, in both cases, to home confinement with electronic monitoring until the COVID-19 emergency is over. For efficiency, I propose that this combined application be referred to the duty magistrate judge.

I.      **PRELIMINARY STATEMENT**

      Mr. Wilburn is charged in Case No. 19 Cr. 139 (RJD) with access device fraud and aggravated identity theft, in connection with a scheme to buy (and then sell) Amtrak eVouchers using stolen credit card numbers. He is charged in Case No. 19 Cr. 108 (MKB) with production and possession of child pornography—contraband that was allegedly discovered during Amtrak's investigation into the fraud case.

      Mr. Wilburn has been detained at MDC Brooklyn since February 21, 2019, pursuant to orders of detention issued by Magistrate Judge Kuo at his initial presentment in both cases. The defense did not object to detention at that time, and has not presented a bail package until now. In light of Mr. Wilburn's guilty plea in the fraud case, it has been reasonable for him to remain detained.

      The COVID-19 outbreak has now exploded that calculus. The rapidly worsening public health crisis has a sudden and "material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [Mr. Jackson] as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). There are two reasons to revisit

that issue, and to release Mr. Wilson until the emergency has subsided—pursuant to 18 U.S.C. § 3142(i) in the pornography case (permitting pretrial "temporary release" for a "compelling reason"); and pursuant to 18 U.S.C. § 3145(c) in the fraud case (permitting release pending sentencing if there is "an exceptional reason why . . . detention is inappropriate").

*First*, the COVID-19 outbreak at MDC Brooklyn presents a manifest danger to the health of Mr. Wilburn and those around him. Despite a total lockdown, the number of infected people is steadily growing. There now appear to be at least 5 inmates and 17 staff confirmed positive, according to the most recent figures,[1] and most of those cases arose *after* emergency protocols were put in place. This is doubtless a substantial undercount given the MDC's shockingly low levels of testing and the fact that its protocols ignore asymptomatic transmission. Yet even BOP's admitted positives are growing thousands of times faster than average.

Moreover, while Mr. Wilburn is 34 years old and relatively healthy, he is not immune from severe illness or death if infected. One of the many mysteries of the novel coronavirus is why huge numbers of people like Mr. Wilburn fall victim to it.[2] The frightening truth is that the MDC is endangers Mr. Wilburn's "physical and mental condition," 18 U.S.C. § 3142(g)(3)(A), as well as the safety of the community that would be affected should he fall ill, namely, BOP personnel, other inmates, hospital staff, and patients deprived of scarce medical resources during his treatment.

*Second*, the MDC's emergency protocols have compromised Mr. Wilburn's access to counsel and my ability to prepare his defense. MDC has forbidden legal visits for the past month and both these cases are at a standstill. In the case before Judge Brodie, I am trying to prepare a motion challenging Amtrak's forensic electronic search, but I cannot make progress without reviewing voluminous discovery with Mr. Wilburn in person, or at least with our simultaneous access to the relevant data for a meaningful period of time. That is impossible under current protocols. As for the fraud case, sentencing has been adjourned *sine die* due to the pandemic.

These are "compelling" and "exceptional" reasons warranting Mr. Wilburn's temporary release pursuant to Sections 3142(i) and 3145(c). Mr. Wilburn's mother and girlfriend are eager to have him stay with either of them on home confinement, even with the necessary electronic restrictions, because they do not want Mr. Wilburn to fall ill at MDC. The proposed bail conditions are extremely restrictive, and would, as the Adam Walsh Act contemplates, mitigate any risk of flight or danger to the community, until the emergency lifts and Mr. Wilburn would again be safe and have meaningful access to counsel at the MDC.

---

[1] https://www.bop.gov/coronavirus/ (accessed Apr. 17, 2020) (updated several times daily) (showing 4 positive inmates, 17 positive staff); https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200416_053113.pdf (report dated Apr. 16, 2020, claiming 5 positive inmates, 16 positive staff).

[2] *Hundreds of young Americans have now been killed by the coronavirus, data shows*, The Washington Post (Apr. 8, 2020) (a third of New Yorkers between ages 30 and 39 killed by the virus had no preexisting "contributing factor"), *at* https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/

## I. THE MDC IS FAILING TO STOP THE SPREAD OF COVID-19, EVEN WITH THE FACILITY ON TOTAL LOCKDOWN

### A. Prisons Present An Extraordinary Risk Of COVID-19 Infection

We are suddenly facing a public health crisis of generational significance. COVID-19 is now a global pandemic.[3] In this country, its spread has been exponential. On January 21, 2020, Washington State announced the first confirmed case.[4] There are now almost 600,000 recorded cases nationwide, and more than 25,000 people have died from the novel coronavirus.[5]

Despite a state of emergency and unprecedented shelter in place restrictions, New York is "a world epicenter of the coronavirus outbreak," with over 200,000 confirmed positives, over 10,000 fatalities in New York City alone,[6] and hospitals reporting critical shortages of medical equipment.[7]

Under ordinary conditions, the coronavirus is highly contagious. On average, one infected person will infect between two to three other individuals.[8] But the situation in prison is especially dangerous. Conditions of detention create the ideal environment for the transmission of contagious disease.[9] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations"—"infection control is challenging in these settings."[10]

Recognizing these special risks, and in an effort to reduce the spread of infection in incarcerated populations, jails and prisons nationwide have started to proactively release inmates—not just those at high risk of infection, but others who, if released under appropriate

---

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[4] First Patient With Wuhan Coronavirus Is Identified in the U.S., The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[5] U.S.: Latest Map and Case Count, The New York Times (Apr. 16, 2020), at https://nyti.ms/2U4kmud (updating regularly).

[6] N.Y.C. Death Toll Soars Past 10,000 in Revised Virus Count, The New York Times (Apr. 14, 2020), at https://www.nytimes.com/2020/04/14/nyregion/new-york-coronavirus-deaths.html

[7] Coronavirus; New York Update, The New York Times (Apr. 16, 2020), at https://www.nytimes.com/2020/04/16/nyregion/coronavirus-new-york-update.html (updating regularly).

[8] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[9] Joseph A. Bick (2007) Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS

conditions, would not pose a danger to the community or risk of flight. For example, New York City has released 650 inmates from its jails, from parole violators to those accused of violent crimes, due to hundreds of people being infected there.[11] Thousands more people have been released nationwide.[12]

### B. The MDC Has Recognized Its Conditions Present A High Risk Of Infection

The MDC houses approximately 1,700 people, the majority detained in small two-person cells with a shared toilet and sink, who ordinarily eat meals and have recreation in groups of 70 or more. Other units are open dorms that house 70 or more inmates with no ability to separate.

It is not a quarantined space. Even on lockdown, inmates cycle in and out from city, state, and federal facilities. New people arrive regularly, whether new arrests, people in transit, or correctional officers, contractors, and other workers arriving every day from New York and surrounding states.

The MDC has recognized the high risk of infection that its conditions present, and has implemented emergency restrictions to try to reduce the spread. Legal and social visits have been forbidden since March 13, 2020. It has also represented to the Chief Judge that it has been "screening" staff members and new inmate arrivals, and quarantining or isolating any new or symptomatic inmates.[13]

Since April 1, 2020, the facility has also taken the extraordinary step of locking every inmate in their cells for 24 hours a day, only letting them out for an hour three times a week to shower and use the phone or email. It is the functional equivalent of putting every inmate in the Special Housing Unit, isolation cells ordinarily used for punishment. The only exception appears to be inmate orderlies, who must clean the potentially infected common areas.[14]

### C. Current Protocols Are Failing To Stop The Spread

Despite the current emergency protocols, the spread of infection at MDC has been inexorable. On March 21, 2020, the first inmate there tested positive.[15] He arrived from Rikers Island, passed the MDC's health screening, and "complained of chest pains . . . a few days after he arrived."[16] As of today, the number of confirmed infected people had reportedly grown to 5

---

[11] "'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail," The New York Times (Mar. 30, 2020), at https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html
[12] *See* https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-toprevent-coronavirus-outbreak-behind-bars/; *and see* https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.
[13] https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf
[14] *Id.*
[15] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.
[16] *Id.*

4

positive inmates and 17 positive staff members.[17]  Most of that growth has occurred *after* April 1, 2020—the day the facility locked down.

April 1 was also the day the MDC revealed it "had tested only two additional inmates," for a grand total of three tests, "after five staff members and one prisoner were found to be infected with the coronavirus." "[G]overnment counsel admitted under questioning by U.S. Judge Rachel P. Kovner that the Metropolitan Detention Center in Brooklyn had done little testing after finding an inmate was positive for the virus, despite featuring the single infection as evidence that the facility was not unsafe for ailing inmates nearing their release dates."[18]

Since April 1, its positive cases have grown by an order of magnitude, but the MDC has kept its head firmly in the sand.  It has apparently still tested only 11 out of approximately 1,700 inmates.[19]  The government is therefore blind to how much higher the true number of infected people is.  As Judge Kovner asked government counsel at the April 1, 2020 hearing, "How probative is it that there's only been one positive test – if we're talking about one out of three?"  It was a rhetorical question.  The obvious answer, given the shocking amount of under-testing, is not at all.[20]

To be clear, the problem is not one of numbers.  The problem is that under-testing dramatically raises the risk of infection for inmates and personnel.  Without a meaningful amount of testing, it is impossible to identify infected inmates, effectively isolate them, and quarantine those with whom they had contact.  As we are seeing, the result is increasing spread, illness and potentially death.

It is therefore no surprise that in New York facilities, where testing has been more robust, the numbers of positive cases are much higher, and have grown considerably as testing has increased.  For example, the Queens Detention Facility ("GEO") reported 4 tests and 1 positive case on April 3, 2020.[21]  By yesterday, testing had been increased to 37 inmates, and the facility

---

[17] https://www.bop.gov/coronavirus/ (accessed Apr. 17, 2020) (updated several times daily) (showing 4 positive inmates, 17 positive staff); https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200416_053113.pdf (report dated Apr. 16, 2020, claiming 5 positive inmates, 16 positive staff).

[18] Frank G. Runyeon, *Prison Says It Tested Just 2 More Inmates Despite Virus Cases*, Law 360 (Apr. 1, 2020), https://www.law360.com/access-to-justice/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases

[19] https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf

[20] A leading expert warns that, with respect to "COVID-19 statistics, especially the number of reported cases, . . . [t]he data, at best, is highly incomplete, and often the tip of the iceberg for much larger problems," such that, "if you're not accounting for testing patterns . . . [y]our analysis could be off by an order of magnitude."  For example, due to under-testing, "the number of detected cases in the United States could underestimate the true number of infected people by anywhere from a multiple of two times to 100 times." https://fivethirtyeight.com/features/coronavirus-case-counts-are-meaningless/

[21] https://img.nyed.uscourts.gov/files/reports/qdf/20200403%20QDF%20Report.pdf

received 25 positive results.[22] GEO houses at most 222 people[23]—the comparable percentages at MDC are terrifying. Similarly terrifying are the positive cases at Rikers Island: at least 334 inmates have tested positive there, implying an infection rate of at least 8.14%, which is seven times higher than the rate in New York City.[24]

By any measure, the problem is widespread and growing steadily, and the risk of infection is high and uncontained. Indeed, even with the BOP's frighteningly low levels of testing generally, this Office's record of their published tested-positive cases shows a dramatic rise since March 20, 2020, from 2 confirmed cases among inmates and staff on that date to 729 as of today. Sixteen federal inmates have already died from COVID-19. From our analysis, even with the underreporting, that is a 36,450% rate of increase inside BOP facilities, which dwarfs the itself astounding 3294% rate in the nation at large.

What is particularly astounding is that BOP has, by its own admission, not tested huge numbers of symptomatic inmates, a point that further undercuts the reliability or even relevance of their published testing numbers. This Office recently received information and statistics that the BOP provided to Congress, reflecting *thousands* of unreported "open" cases, meaning "suspected, presumed positive, or clinically confirmed" cases, beyond what their official numbers reflect: 456 people in isolation and 3,850 inmates in quarantine as of the morning of April 7, 2020. Corroborating these figures, the Washington Post has reported that, at Oakdale FCI, "[i]nmates must have a fever and other covid-19 symptoms to be placed in isolation, staff and inmates say. Once they are there, *bureau officials acknowledge* that only those ill enough to be taken to a hospital are tested for the coronavirus." (emphasis added).[25] It is doubtless, then, that BOP's published numbers are a bare minimum, and the true number of infected inmates is much, much higher.

In light of the unseen spread in BOP facilities, then, it is tragic but unsurprising that BOP's numbers tend to seem fine until they quickly do not. There were relatively small numbers of reported tested-positive cases at Butner Medium FCI, Oakdale FCI, and Elkton FCI, from March 21, 2020 until the figures suddenly spiked and multiple fatalities occurred in a four-day period at the beginning of April. We fear a similar sudden catastrophe at MDC.

### D. MDC Protocols And Practice Fail To Address Asymptomatic Transmission

One obvious reason for BOP's failure to stem the outbreak at MDC is that a substantial amount of COVID-19 transmission happens invisibly. The Director of the CDC explained last month that "a significant number of individuals that are infected"—he put the number at "as

---

[22] https://www.nyed.uscourts.gov/pub/bop/QDF_20200414_041032.pdf
[23] https://queenseagle.com/all/covid19-queens-detention-facility-private-jail
[24] https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (updating regularly)
[25] "Inside the deadliest federal prison, the seeping coronavirus creates fear and danger," The Washington Post (Apr. 9, 2020), *at* https://www.washingtonpost.com/national/inside-the-deadliest-federal-prison-the-seeping-coronavirus-creates-fear-and-danger/2020/04/09/deeceb6e-75b4-11ea-a9bd-9f8b593300d0_story.html

many as 25%"—"actually remain asymptomatic" and "contribute to transmission."[26] He continued:

> [O]f those of us that get symptomatic, it appears that we're shedding significant virus in our oropharyngeal compartment, probably up to 48 hours before we show symptoms. This helps explain how rapidly this virus continues to spread across the country, because we have asymptomatic transmitters and we have individuals who are transmitting 48 hours before they become symptomatic.[27]

Of course, this is exactly why everyone in New York must wear masks, and the CDC recommends that everyone do so.

That 25% estimate is extremely conservative. A recent case study illustrates the point. The Navy recently tested the entire 4,800 crew of an aircraft carrier, after a few crewmembers were symptomatic and tested positive. With 94% of the results in, *roughly 60% of the over 600 who have tested positive were asymptomatic*.[28]

But because they do not test robustly, the MDC's protocols utterly fail to address asymptomatic transmission. Inmates are isolated (if at all) when they become symptomatic, by which time they have necessarily interacted with multiple other inmates in their unit and multiple BOP personnel. Similarly, the "screening" of new inmates and arriving staff checks only for symptoms—any infected yet asymptomatic people pass through undetected.

This is not theoretical. It is exactly what happened to the very first individual who tested positive for coronavirus at the MDC. He was reportedly in the facility for days before becoming symptomatic.[29] During that time, he would have had contact with MDC inmates in the intake unit (who transit in and out and are moved all over the facility), as well as inmates from other facilities (when he was in the courthouse cellblock), to say nothing of the U.S. Marshals, BOP staff, and court staff.

MDC's failures to protect its inmates and staff from infection are not limited to under-testing. Inmates regularly report that it has not met even the most basic recommendations of the CDC for preventing the spread of the coronavirus. Staff are not wearing face masks or gloves in the jail. Hand sanitizer is not available. Although the MDC is finally providing bar soap to inmates, not every inmate has access to soap and what soap they receive is a small bar, hardly enough for regular handwashing. Only those inmates who have money for commissary can purchase the additional soap they need to prevent infection. In addition, there are increasing and troubling reports from MDC staff that the facility is not even following its own protocols. Staff

---

[26] https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us
[27] *Id.*
[28] https://www.reuters.com/article/us-health-coronavirus-usa-military-sympt-idUSKCN21Y2GB
[29] 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

7

have alleged failures of quarantine procedure, symptomatic guards ordered back to work, and a lack of soap and masks for staff.[30]

### E. The MDC Is Threatening The Safety Of Its Inmates And The Larger Community, And Materially Restricting Access To Counsel

While the MDC fails to prevent the spread of infection, inmates are locked in their cells, indefinitely, with no protection. They see new arrivals come into the units, they see staff walk in and out without masks, and in the brief period where they are permitted to shower and use the phones, they must necessarily congregate together. It is a terrifying experience, with no end in sight.

Nor is there any confidence inmates would be treated with appropriate medical care when they do get infected. The MDC has only three doctors for all 1,700 inmates, no medical ward, and not a single ventilator. It is obviously unequipped to manage and respond to a viral contamination.

Its track record for even routine medical conditions is poor.[31] In times of crisis, it has failed entirely. For an entire week in January and February 2019, during the sub-zero temperatures of the "Polar Vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time and denied hot food or additional blankets and warm clothing.[32] Those inmates with serious pre-existing physical and mental illnesses received no care.[33] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to the available floors with electricity, were not taken.[34] The "very cruel conditions" prompted multiple judges to grant downward variances to those defendants who suffered then. Tr. of Sent. H'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC) (E.D.N.Y. Jun. 4, 2019) (ECF No. 16); *see, e.g.*, *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019); *United States v. Lewis*, 18-CR-565 (ENV) (E.D.N.Y. 2019); *United States v. Williams*, 19-CR-5 (KAM) (E.D.N.Y. 2019); *United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019).

Moreover, it is not just inmates whose health is affected by the unseen and unmitigated spread of the coronavirus at MDC. BOP personnel, contractors and any other personnel in the

---

[30] https://www.nydailynews.com/new-york/ny-mdc-brooklyn-jail-coronavirus-20200407-o5wrhffchjfvpk5b7thglvzury-story.html; https://theintercept.com/2020/04/10/prison-coronavirus-mdc-bop/

[31] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at* https://bit.ly/39JRhdW.

[32] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), *at* https://nyti.ms/2sXCIQg; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[33] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[34] *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, Office of the Inspector General, U.S. Department of Justice at 29 (September 2019) *at* https://oig.justice.gov/reports/2019/e1904.pdf.

prison are just as vulnerable, as the rocketing numbers of infected staff reflect. And for any inmates or personnel who require hospitalization, that is one more patient endangering the health care workers on the front line of the epidemic, and one more patient to whom scarce medical resources must be devoted.

In addition, the impact on access to counsel has been material. No in-person visits have been permitted since April 13, 2020. That means attorneys cannot use a computer to review electronic discovery with their clients. Attorney calls and videoconferences have been permitted, but they have been slow to schedule (if they are scheduled at all), and are available only for 15 minute increments—enough time for a brief check-in with a client, nothing more. The impact on the attorney-client relationship is especially severe because, given the shelter in place command in New York, counsel are far less efficient than they have been, being forced to work from home.

\* \* \*

The MDC is on the brink of a public health disaster. *See also Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, F.3rd. __, 2020 WL 1320886, at \*12 (2d Cir. March 20, 2020) ("The impact of this recent emergency on jail and prison inmates … is just beginning to be felt. Its likely course of we cannot foresee. Present information strongly suggest, however, that it may be grave and enduring."). Indeed, from the information discussed above, it appears the disaster has already arrived. It is thus critical to flatten the curve at MDC by discharging all bailable inmates, even cases that might not otherwise have qualified for release absent a public health emergency. The government itself has recognized this need, having instructed the BOP to "expand the cohort of inmates who can be considered for home release" and "move with dispatch in using home confinement" in light of "significant levels of infection" at numerous facilities. Memorandum of A.G. Barr, Apr. 3, 2020, at 1.

**II. THE COVID-19 OUTBREAK IS A "COMPELLING" AND "EXCEPTIONAL" REASON FOR RELEASE FROM THE MDC UNDER THE BAIL REFORM ACT**

The Bail Reform Act provides for temporary release in this emergency context, in both the pretrial and the post-plea context.

**A. The Danger Of Infection And Infringement On Access To Counsel Are "Compelling" Reasons For Temporary Pretrial Release**

The Bail Reform Act provides for the "temporary release" of a person detained in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

There is no more "compelling reason" than a defendant's physical health, particularly when it has been compromised by the MDC's failure to provide adequate care and its in capacity to prevent the spread of COVID-19. *See, e.g.*, *United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant).

9

Moreover, "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)." *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, •3 (S.D.N.Y. Mar. 19, 2020); *see also United States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (collecting cases); *and see infra* Section II.C (collecting cases releasing defendants pretrial under this provision in the COVID-19 context).

### B. The COVID-19 Outbreak Is An "Exceptional" Reason For Release Pending Sentencing

The Bail Reform Act also provides for the release presentence in this emergency context. 18 U.S.C. § 3145(c) provides:

> A person subject to detention [pending sentence] pursuant to section 3143(a)(2) . . . and who meets the conditions of release set forth in section 3143(a)(1) [*i.e.*, has been found by clear and convincing evidence "not likely to flee or pose a danger to the safety of any other person or the community if released" under appropriate conditions], may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

The risk to an inmate's health from being unprotected from risk of infection, severe illness, or even death is an "exceptional" reason warranting release under this provision. *See United States v. McDuffie*, No. 19-CR-212 (VEC), 2020 WL 1659879, *1 (S.D.N.Y. Apr. 3, 2020) (even defendant subject to mandatory detention by his plea should be released under § 3145(c) because he had shown by clear and convincing evidence that he was neither a risk of flight or a danger to the community and there was "an exceptional reason why his detention [was] inappropriate," namely the "once-in-a-lifetime pandemic" and the defendant's vulnerability to it); *see also, e.g., United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, *3 (S.D.N.Y. Mar. 31, 2020) ("Indeed, by any reasonable standard, the risks posed to [defendant] by COVID-19 if he remains in custody constitute 'exceptional reasons' why his detention is not appropriate at the time."); *United States v. McKenzie*, No. 18 Cr. 834 (PAE), 2020 WL 1503669 (S.D.N.Y. Mar. 30, 2020) (releasing defendant post-plea due to pandemic under § 3145(c)); *and see United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) ("[D]istrict courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'").

### C. Judges Are Steadily Releasing Inmates Under These Provisions Due To The COVID-19 Pandemic

Judges have begun to recognize that previous orders of detention must be revisited now that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent." *Stephens*, 2020 WL 1295155, *2.

10

In addition to the cases cited above, judges in this District have been steadily releasing inmates in the face of the COVID-19 emergency at the MDC (and MCC). *See, e.g., United States v. Delgado*, No. 19 Cr. 200 (ENV) (JO) (releasing, over government objection, defendant who had pled guilty to being a felon in possession of a firearm, despite not being at "high risk" for COVID-19 infection); *United States v. Eli*, 20-CR-50 (RJD) (RER) (releasing, over government objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk); *United States v. Allen*, 18-CR-561 (DLI) (CLP) (releasing, over government objection, defendant with asthma, sickle cell disease, and low blood count charged with drug conspiracy resulting in serious bodily injury, facing twenty year mandatory minimum); *United States v. Jackson*, 18-CR-606 (JS) (releasing, over government objection, defendant with asthma, sleep apnea, obesity and hypertension in drug conspiracy case, in which she faces 360-life career offender guidelines); *United States v. Williams*, 18-CR-657 (ARR) (releasing, over government objection, ACCA defendant); *United States v. Woolfolk*, 18-CR-115 (DLI) (RER) (releasing, over government objection, defendant with epilepsy to a shelter); *United States v. George*, 19-CR-327 (ENV) (releasing, over government objection, defendant exhibiting COVID-like symptoms who jumped out a second floor window to avoid arrest); *United States v. Prince*, 19-CR-452 (PKC) (granting bond, over government objection, subject to conditions, defendant with asthma charged with felon in possession); *United States v. Rivera*, 11-CR-20 (RJD) (RER) (releasing, over probation objection, VOSR defendant without pre-existing conditions); *United States v. Plasencia*, 20-MJ-205 (SJB) (releasing, on consent, defendant charged with illegal possession of a firearm after having been previously convicted of a felony attempted armed robbery); *United States v. DeAlba*, 19-CR-563 (DLI) (SJB) (releasing, on consent, defendant charged in heroin and methamphetamine due to a combination of medical conditions, none on the CDC list); *United States v. McKenzie*, 20-CR-120 (WFK) (releasing, on consent, defendant with asthma in passport fraud case); *United States v. Cruz-Sanchez*, 19-CR-588 (LDH) (releasing, on consent, defendants with pre-diabetes, high cholesterol, and hypertension in drug distribution case); *United States v. Sienkiewicz*, 19-MJ-859 (JO) (releasing, on consent, defendant in extradition matter); *United States v. Grubisich*, 19-CR-102 (RJD) (SMG) (removing unmet prior requirement of a fifth suretor to release defendant); *United States v. Cooper*, 18-CR-655 (MKB) (releasing, on consent, defendant in drug conspiracy case); *see also United States v. Capaldo*, 19-CR-442 (ILG) (MKB); *United States v. Khan*, 20-CR-127 (LDH); *United States v. Espinal*, 17-CR-231 (RRM) (RER); *United States v. Ocasio*, 17-CR-323 (LDH); *United States v. Mundo*, 17-CR-125 (LDH) (CLP).

### III. MR. WILBURN'S PROPOSED BAIL PACKAGE WARRANTS HIS RELEASE UNDER THESE STANDARDS IN LIGHT OF THE RISK OF INFECTION AT MDC AND THE MATERIAL RESTRICTIONS ON HIS ACCESS TO COUNSEL

Under the above standards, Mr. Wilson should be released until the emergency passes. The MDC has failed to protect him from infection. He is at risk for severe illness or even death, as are the BOP personnel, other inmates, and hospital workers that would be exposed to him. Moreover, Mr. Wilburn has no meaningful access to counsel while the MDC's emergency conditions are in place—he is locked in his cell indefinitely with both cases at a standstill.

Because he presents no risk of flight or danger to others while on home confinement in either of the stable residences we have proposed, particularly in light of the Adam Walsh Act

conditions which were designed to mitigate those risks, Mr. Wilburn should be temporarily released.

### A. The Risk Of Mr. Wilburn's Infection At MDC Warrants His Temporary Release Until The Emergency Passes

The MDC's failure to prevent the spread of COVID-19 infection is a "compelling" and "exceptional" reason warranting Mr. Wilburn's temporary release in both cases, under § 3142(i) and § 3145(c), respectively. As discussed above, the MDC's stubborn unwillingness to test its inmates robustly, its blinkered focus on symptoms and shocking failure to account for substantial asymptomatic transmission, and its apparent inability to follow its own protocols, has put the facility on a fast-track to disaster. The experience of other BOP facilities is that under-testing and pandemic protocols seemingly keep things contained, until they suddenly do not, and fatalities spike. Indeed, even the *admitted* spread of the virus in BOP is thousands of times higher than the national average.

The risk to Mr. Wilburn's physical health is substantial. Something must be done, because the MDC is failing to protect him. Though Mr. Wilburn is relatively young, he is not immune from severe illness or death if infected. One of the many mysteries of the novel coronavirus is why huge numbers of younger, healthy people just like Mr. Wilburn fall victim to it.[35]

In recent filings, the government has minimized the impact of the coronavirus on inmates who are not already known to be at "high risk" for illness, but the Supreme Court has made clear that prisons may not wait to see if a prisoner falls ill from infectious disease before doing something about it:

> In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Helling v. McKinney*, 509 U.S. 25, 33 (1993). Indeed, *Helling* found that exposure to *tobacco smoke* was an issue of Eight Amendment dimension in prisons. *Id.* Surely exposure to a

---

[35] *Hundreds of young Americans have now been killed by the coronavirus, data shows*, The Washington Post (Apr. 8, 2020) (a third of New Yorkers between ages 30 and 39 killed by the virus had no preexisting "contributing factor"), *at* https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/

coronavirus that has caused the entire State of New York to mandate that all its citizens "shelter in place," wear masks in public, and engage in social distancing warrants similar concern.

Yet the frightening truth is that the MDC has failed to protect Mr. Wilburn, in all the ways we have described. Nor is the impact on his physical health the only consequence. He has been on lockdown for over a month, trapped in his cell and waiting for infection, except for times that he, as an orderly, has been instructed to clean potentially infected common areas (without sufficient personal protective equipment), and except for the three hours weekly that he must congregate with others in his unit for showers and to communicate with the outside world. The result has been depression. When he is not resigned to being infected, he is pleading to be let out.

Moreover, the MDC is not only endangering Mr. Wilburn's "physical and mental condition," 18 U.S.C. § 3142(g)(3)(A), its under-testing, obliviousness to asymptomatic transmission, and failure to observe its own protocols puts at risk the safety of the community that would be affected should Mr. Wilburn fall ill, namely, BOP personnel, other inmates, hospital staff, and patients deprived of scarce medical resources during his treatment.

As Judge Daniels recently observed, when a defendant moves for release on the basis of a "compelling reason," courts must carefully balance the "total harm and benefits to prisoner and society that continued pretrial imprisonment of [a defendant] will yield." *United States v. Little*, No. 20 CR 57(GBD), 2020 WL 1439979, at *5 (S.D.N.Y. Mar. 24, 2020). That logic applies equally in the "exceptional reason" context, and here it warrants release. The "total harm" to Mr. Wilburn and society would be extraordinary if he remains at MDC.

### B. The Impact Of MDC's Lockdown Protocols On Mr. Wilburn's Access To Counsel Warrants His Temporary Release Until The Emergency Passes

The infringement of Mr. Wilburn's meaningful access to counsel, which he requires in order to move his cases forward, constitutes a second "compelling" and "exceptional" reason for release. As Judge Nathan has found, "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)." *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, •3 (S.D.N.Y. Mar. 19, 2020); *see also United States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (collecting cases).

The same logic applies in the presentencing context, because the issue is one of constitutional dimension. The Sixth Amendment right to counsel is a cornerstone of our adversarial system. A detention facility violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). In *Benjamin,* the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179.

13

Here, the MDC violated the right to counsel by abruptly cancelling legal visits altogether, on March 13, 2020, without offering any meaningful alternative for Mr. Wilburn. The only alternative on offer is for telephone or video calls in 15-minute increments. These are scheduled only occasionally (if at all), but the main point for Mr. Wilburn is that I must meet with him, at length and with a computer, to discuss the complex and voluminous electronic discovery that is necessary to prepare his motion challenging the forensic search. That is not possible under current protocols.

For the same reason, we cannot meaningfully discuss sentencing in the fraud case, because the two cases interconnect. As a consequence, Mr. Wilburn is locked down with both his cases at a standstill, for what appears to be an indefinite period of time. While the original idea was for the lockdown to last until April 13, now both the lockdown and the attorney visit prohibition have been extended to mid-May, and there is no reason to think that will be the end date for either protocol.

By any measure, this is an "unreasonable" interference with Mr. Wilburn's defense and access to counsel. It is unreasonable in manner, time period, and purpose. It warrants Mr. Wilburn's temporary release, so he and I can communicate effectively to move his cases forward.

### C. Mr. Wilburn Presents Neither A Risk of Flight Nor A Danger To The Community If Released Under The Proposed Conditions

The defense proposes that Mr. Wilburn be released on home confinement to the home of his mother, Linda Wilburn, in Wilkes Barre, Pennsylvania. She is a retired Correctional Officer with the New York City Department of Corrections, and she lives alone in a two-bedroom apartment, where Mr. Wilburn could sleep in the other room. While Ms. Wilburn is not currently working, the other proposed suretor, Mr. Wilburn's girlfriend Ashley Cotto is still employed as a bank teller, an essential worker.

Ms. Cotto lives alone in an apartment in Watervliet, New York, and would also be willing to have Mr. Wilburn reside there if that is easier for Pretrial Services. Both proposed suretors are willing to serve as third-party custodians, and both are aware of the electronic monitoring restrictions required to be in place in Mr. Wilburn's residence pursuant to the Adam Walsh Act. Their principal concern is that Mr. Wilburn be released so he does not fall ill at the MDC.

Under these proposed restrictions—home confinement, electronic monitoring as directed by Pretrial Services, two suretors, and a potential third party custodianship—Mr. Wilburn would not present either a risk of flight or a danger to the community. Mr. Wilburn has no criminal history. These are secure residences where the only other resident is an adult, and potential custodian, whom Mr. Wilburn knows and loves. Mr. Wilburn would have no access to the Internet and any devices would be monitored by Pretrial, and largely restricted to what he needs to help prepare his defense.

Nor, in the unusual context of this pandemic, does Mr. Wilburn have any real incentive to flee—if he had anywhere to flee to, or means of doing so, which he does not. Mr. Wilburn's principal concern is not being infected with the virus in jail. If he is released, he would only further risk infection if he were somehow able to flout the shelter in place requirements currently in place in the community. The ordinary presumption of detention in these cases is rebutted in this exceptional context. *See United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001) ("In a presumption case ... a defendant bears a limited burden of production [—]not a burden of persuasion[—]to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight.").

Moreover, in light of the fact that Mr. Wilburn is facing a discretionary Guidelines sentence in the fraud case over and above the two-year minimum, his incentive is to comply perfectly with his release conditions to prove to Judge Dearie that he no longer presents a threat of future fraud. And in the other case, his most salient incentive is to work closely with me on a motion that could potentially be dispositive.

Above all, Mr. Wilburn is frightened of the spreading virus, and unable to protect himself from it. The MDC has abdicated its responsibility to do so. He should be released until the crisis has passed.

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Tel. (646) 258-6178 (mobile)
james_darrow@fd.org

*Attorneys for Andre Wilburn*

cc: Counsel of record (by ECF)
U.S. Pretrial Services Officer Melony C. Bedford (by email)