

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RTP:VTN
F. #2018R01745

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 22, 2020

<u>By Email and ECF</u>

The Hon. Raymond J. Dearie
The Hon. Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: United States v. Lamont Brown, <u>et al</u>., Cr. Dkt. 19-139 (RJD)
       <u>United States v. Andre Wilburn, Cr. Dkt. 19-108 (MKB)  </u>

Dear Judge Dearie and Judge Brodie:

    The government respectfully submits this letter in response to the defendant's April 17, 2020 motion for temporary release from the Metropolitan Detention Center in Brooklyn ("MDC") due to the COVID-19 pandemic. <u>See</u> Def. Mot. of Apr. 17, 2020 ("Def. Mot.").

    As set forth below, because there is no condition or combination of conditions that will reasonably assure the defendant's future appearance in court and the safety of the community, and because the defendant is not uniquely situated with respect to his risk of infection from Coronavirus disease – indeed, he is a 34-year old male with no underlying medical conditions – the defendant should continue to be detained pending trial, and his motion should be denied.

I.  <u>Background</u>

    On October 24, 2019, the defendant pleaded guilty to one count of aggravated identity theft and one count of access device fraud before Magistrate Judge Lois Bloom under Criminal Docket No. 19-139 (RJD). He is awaiting sentence and faces a statutory minimum sentence of 24 months' imprisonment for his conviction of aggravated identity theft and an effective Guidelines range of 54 to 61 months, according to the Presentencing Report ("PSR") prepared by the United States Probation Department. PSR ¶ 74.

The defendant's above-described convictions stem from his role in a criminal conspiracy in which he and a co-defendant obtained stolen personal identifying information ("PII"), including credit card account numbers, and used the PII to purchase Amtrak reservations. The defendant then cancelled or exchanged those reservations for Amtrak eVouchers. The defendant and his co-defendants then sold those eVouchers online at websites including eBay.com and craigslist.com. The defendant is responsible for a loss of nearly half a million dollars to Amtrak.

As part of the investigation of the above-described scheme, law enforcement agents obtained a warrant authorizing the search of the defendant's Google Drive account. During the execution of that search warrant, agents identified images of child pornography ("CP"). Subsequently, agents obtained warrants to search the defendant's Google Drive and his apartment for evidence of possession of CP and related crimes. The evidence revealed that the defendant possessed more than 100,000 images of CP on four different electronic data storage devices. Among the recovered images were approximately 15 images that the defendant, in 2016, took of the then two-year-old daughter of a person known to the defendant. The images were taken in the defendant's apartment.

As a result, the defendant is charged under Criminal Docket No. 19-108 (MKB), in a superseding indictment, with one count of sexual exploitation of a minor and four counts of possession of CP. If convicted of the top count of sexual exploitation of a minor, the defendant faces a mandatory minimum sentence of 15 years' imprisonment.

The defendant now moves for temporary release due to the potential that he may contract COVID-19 while incarcerated at the MDC. The defendant acknowledges that he is a "relatively healthy" 34-year-old, Def. Mot. at 2, and he does not identify any specific health concerns or pre-existing conditions that make him particularly susceptible to contracting the virus. The defendant moves for bail based solely on the existence of the COVID-19 crisis and its overall impact on inmates.

II.     The Defendant Is a Flight Risk and a Danger to the Community

Pursuant to the Bail Reform Act, the charges in the superseding indictment pending before Judge Brodie carry a statutory presumption that no condition or combination of conditions will reasonably assure the defendant's appearance in court and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). The government respectfully submits that the defendant's proposed bail package – consisting of home detention at either his mother's or girlfriend's home, enforced with electronic monitoring – and his assertions that he has no incentive to flee (Def. Mot. at 15), do not rebut this the statutory presumption. Below, the government assesses the most salient factors for the Court's consideration, pursuant to 18 U.S.C. § 3142(g).

First, the charges in the superseding indictment are extremely serious and bear directly on the issue of danger that the defendant would pose to the community if he were to be released. The defendant is charged with possessing more than 100,000 images of CP that

he collected for several years on four different electronic devices.  Even more disturbing is that the defendant has not only collected a vast cache of CP but has also produced images of CP of a two-year-old child who was temporarily placed in the defendant's care by an individual who trusted the defendant.  "No one questions that child pornography is an insidious offense since it takes advantage of a particularly vulnerable segment of society, children."  United States v. Valerio, 9 F.Supp.3d 283, 289 (E.D.N.Y. 2014) (quoting United States v. Schenberger, 498 F.Supp.2d 738, 742 (D.N.J. 2007).  As the Third Circuit has pointed out in connection with Congress's findings on Section 2251, "Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.'"  Valerio, 9 F. Supp.3d at 289 (citing United States v. MacEwan, 445 F.3d 237, 250 (3d Cir. 2006).  The defendant's bald claim that he does not present a danger to the community (Def. Mot. at 14), despite the abhorrent conduct with which he is charged, is unfounded.  The clear and convincing evidence shows that the defendant is a significant danger to children and to the community generally.

   Second, the weight of the evidence against the defendant is strong.  The thousands of CP images found on the defendant's electronic storage devices are damning.  The photographs of the above-mentioned two-year-old child were taken in the defendant's home, where unique characteristics of the defendant's home are visible, and depict parts of the defendant's body.  The child depicted in those photographs has been identified and the government can establish the means and methods by which the defendant photographed and otherwise exploited the victim.

   Third, the defendant's risk of flight is significant.  The defendant was arrested on January 16, 2019, in the Southern District of California, where he had fled once he knew he was wanted by law enforcement authorities.  The defendant knew that he was being sought by federal agents because agents had conducted an authorized search of his apartment in September 2018 and because agents had spoken with members of the defendant's family in December 2018 in an attempt to determine the defendant's whereabouts.

   The clear and convincing evidence establishes that the defendant absconded to a state where he has no known family or relatives because he wanted to avoid apprehension.  Text messages exchanged between the defendant and a person known to the government ("Witness") approximately two weeks prior to his arrest demonstrate that he was "on the run" from law enforcement:

> Witness: Why are you on the run?
>
> Defendant: Dumb [stuff], I caught up in the glamorous life and in the last year and a half, I took great risks to support it.
>
> Witness: Like what?

3

>    Defendant:   New [stuff], identity theft mostly
>                 By the way, the aforementioned information is not to he [sic]
>                 disclosed to anyone.

Prior to his arrest, the defendant also exchanged text messages with the Witness about possessing and potentially using a New York State driver's license in someone else's name. The defendant sent a picture of the identification card and wrote, "IDs aren't easy to come by . . . unless you make em at home . . . but then you can't drive." The defendant's statements are especially noteworthy because evidence gathered during the investigation of the fraud case revealed that the defendant had equipment to make forged credit cards and identification cards in his home. Access to fraudulent identification documents undoubtedly increases the risk of flight posed by the defendant.

Despite the defendant's prior history of evading law enforcement, the defendant argues that he would not be a flight risk because he could be confined to the home of either his mother or his girlfriend. Def. Mot. at 14. It is unclear what, if any, moral suasion either of those individuals have over the defendant under these circumstances.

When federal agents were attempting to locate the defendant and execute the arrest warrant, they interviewed the defendant's mother, in December 2019. She reported, in sum and substance, that (1) she did not know any of the defendant's friends, (2) she did not know if he currently had a girlfriend, (3) she had not seen or spoken to her son in approximately four months, (4) she did not know whether her son was employed, and (5) her son had never visited her home in Wilkes Barre, Pennsylvania. Ms. Wilburn is by no means in a position to serve as a reliable third-party custodian of the defendant.

The other proffered custodian is the defendant's girlfriend, Ashley Cotto. The government contests her fitness as a custodian due to the fact that while the defendant was in California fleeing from authorities, Ms. Cotto was staying with the defendant in a hotel. The defendant had no legitimate reason for being in California, and Ms. Cotto's choice to follow him to California, despite having been raised in New York, suggests that she is not a reliable third-party custodian.

The defendant faces a mandatory minimum sentence of 15 years' imprisonment if convicted in the matter before Judge Brodie and is already facing a mandatory minimum sentence of two years' imprisonment in the matter before Judge Dearie. Given the seriousness of the crimes and the substantial penalties that he faces, the government submits that there is no condition or combination of conditions that will reasonably assure his appearance in court and protect the community from the defendant.

III.   Release Is Not Warranted Under the "Compelling" or "Exceptional" Reason Clauses

The defendant argues that his temporary release is warranted under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another

appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." See Def. Mot. at 9. Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. As Judge Garaufis recently noted in rejecting an application similar to the instant motion, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted).

The defendant alternatively moves for release on bond pursuant to 18 U.S.C. § 3145(c), which requires that the defendant's circumstances rise to the level of "exceptional reasons" such that he should not be detained. Def. Mot. at 10. The defendant carries the burden and must "show by clear and convincing evidence" "that exceptional circumstances render his detention inappropriate." United States v. Luciano, 108 F.3d 1370 at *2 (2d Cir. 1997). The Second Circuit has construed "exceptional reasons" to mean, "a unique combination of circumstances giving rise to situations that are out of the ordinary." United States v. Lea, 360 F.3d 401, 403 (2d Cir. 2004) (quoting United States v. DiSomma, 951 F.2d 494, 497 (2d Cir. 1991).

Beyond being unable to overcome the presumption of detention, the defendant has failed to establish either compelling or exceptional reasons that apply to his specific circumstances. Because the defendant is not uniquely situated with respect to the risk of infection of COVID-19, his general circumstances cannot rise to the level required for release. The defendant has not identified any condition particular to him which places him at greater risk of contracting the virus than any other inmate or at greater disadvantage than any other inmate. To hold that the circumstances confronted by the defendant are "compelling" or "exceptional" would effectively be holding that every healthy inmate should be temporarily released from custody because of COVID-19.

Indeed, the conclusion reached by a growing body of decisions in this district and the Southern District of New York have rejected bail applications based on a defendant's generalized assertions relating to the dangers of COVID-19 where the defendant himself has been found to be a clear danger to the community. See, e.g., United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Lipsky, No. 19-CR-203 (NGG), Mar. 24, 2020 Order (E.D.N.Y.) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic); United States v. Hamilton, No. 19-CR-54 (NGG) 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on

5

defendant's "advanced age and medical conditions," finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained at Valhalla controlled substance and Hobbs Act charges with history of whooping cough); United States v. Acosta, 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus").

Many of the cases cited by the defendant in support of his motion for release are inapposite to the instant case in that they involve specific health conditions which placed the inmates in those cases at higher risk of suffering serious harm if they were to contract COVID-19. See e.g., United States v. McDuffie, 19-CR-212 (VEC), 2020 WL 1659879 (S.D.N.Y. Apr. 3, 2020) (releasing defendant who suffered rheumatoid arthritis (an autoimmune disease), high blood pressure, and cardiac issues); United States v. Nkanga, 18-CR-713 (JMF), 2020 WL 1529535 (S.D.N.Y. Mar. 31, 2020) (granting temporary release of defendant with "multiple health issues" on consent of government); United States v. McKenzie, 18-CR-834 (PAE) (S.D.N.Y. Mar. 30, 2020) (granting temporary release of defendant identified as "high-risk" of getting very sick or dying from COVID-19 who had previously been granted temporary release on consent to attend two funerals).

The defendant also cites United States v. Stephens, 15-CR-95 (AJN), 2020 WL 1295155, (S.D.N.Y. Mar. 19, 2020) to argue that the COVID-19 pandemic qualifies as a compelling circumstance. However, in Stephens, the district court reversed its prior pretrial detention order because "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of the [original detention hearing]" and that the new information "indicates that the Government's case is weaker than it believed to be [at the original detention hearing]." Id. at *1. Notably, the defendant there faced a violation of supervised release charge, id., and his supervised release hearing was scheduled to occur within the week. Thus, the term of the temporary release was quite short and against the backdrop that he did "not pose a danger to the community," id. at *3. The defendant here, whose has already pleaded guilty to a charge that carries a mandatory minimum sentence of two years' imprisonment, faces CP production charges that carry a mandatory minimum sentence of 15 years' imprisonment and has a history of fleeing from justice, is not on similar footing.

In addition, the Bureau of Prisons ("BOP") has implemented national measures to mitigate the spread of COVID-19 within prisons and to protect the defendant and all other inmates from contracting the virus. See Federal Bureau of Prisons COVID-19

6

Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19_update.jsp.  These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended.  (Confidential attorney calls are being provided and inmates are being be provided additional inmate telephone minutes each month.)

- Inmate movement: All inmate facility transfers have been suspended until further notice with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined.  Any inmate currently in BOP custody exhibiting symptoms consistent with COVID-19 will be assessed by the institution's health services staff and placed in medical isolation.  The remainder of the inmates in the unit will be quarantined to ensure that additional inmates do not develop symptoms.  The inmate in medical isolation will be evaluated by medical staff at least twice per day, and the inmates on a medically-quarantined unit will have their temperature checked twice per day.

- Modified Operations:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

As these and other measures demonstrate, the BOP is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.

The defendant also argues that release on bail is warranted because he has been denied his Sixth Amendment right to assistance of counsel since the BOP cancelled legal visits on March 13, 2020.  See Def. Mot. at 13-14.  The Court should reject the defendant's attempt to turn the tables and use the mitigation efforts put in place by BOP, principally the limitations on legal visits, to suggest they create circumstances that justify release.  The defendant's anticipated pretrial motion in the CP case involves a challenge of the forensic search of the aforementioned Google Drive.  See Def. Mot at 14.  The government submits that such a challenge will be based primarily on legal arguments and factual allegations relating to the forensic search, which do not require extensive consultation between counsel and client.  Accordingly, suspending legal visits and offering legal telephone calls sufficiently afford the defendant his right to counsel while protecting the health of the defendant, other inmates and BOP staff.

The defendant has not shown any significant, long-term infringement on his ability to consult with his attorney.  He also has not demonstrated that the infringements put

in place by the BOP do not serve and further a "legitimate penological interest[]." Overton v. Bazzetta, 539 U.S. 126, 131–32 (2003) (upholding restrictions on prison visitation rights). They do serve such an interest, which is protecting the health of people like the defendant and the many employees who work at the MDC.

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion for release. The Court's permanent order of detention should remain in effect because the defendant poses a serious danger to the community and a risk of flight, and he has not presented a basis for his temporary release.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
Virginia Nguyen
Special Assistant U.S. Attorney
(718) 254-6280

cc:     James Darrow, Esq. (by email and ECF)
        Clerk of the Court (RLM)

8